FILED
United States Court of Appeals
Tenth Circuit

April 2, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ELIZABETH DUNCAN,

      Plaintiff - Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

      Defendant - Appellee.

No. 14-5081
(D.C. No. 4:13-CV-00189-FHM)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **GORSUCH**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

Elizabeth Duncan appeals the district court's order affirming the

Commissioner's decision denying her application for disability benefits under the

Social Security Act. We exercise jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C.

§ 405(g), and affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

Ms. Duncan formerly worked for six years as a master teacher at a daycare facility. In 2009, she was diagnosed with bilateral carpal tunnel syndrome. She underwent right carpal tunnel surgery, involving decompression of the right median nerve at the wrist, and right cubital tunnel surgery, involving decompression of the right ulnar nerve at the elbow, in October 2009. She had left carpal and cubital tunnel surgeries in November 2009. She filed for disability benefits in November 2009 alleging disability since October 18, 2009, due to diabetic neuropathy and post carpal tunnel surgeries. The Commissioner denied benefits initially and on reconsideration.

Following a de novo hearing and a supplemental hearing before an Administrative Law Judge ("ALJ"), the ALJ issued his decision in November 2011, finding Ms. Duncan not disabled at step five of the controlling five-step sequential analysis. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (explaining five-step process for evaluating claims for disability benefits). At step one the ALJ found Ms. Duncan had not engaged in substantial gainful activity since the alleged onset of her disability. The ALJ concluded at step two that Ms. Duncan had the following severe impairments: diabetes mellitus with diabetic neuropathy, mild carpal tunnel syndrome bilaterally, degenerative disc disease of the cervical spine, osteoarthritis, hypertension, hyperlipidemia, and major depressive disorder. But he

- 2 -

found that these impairments did not meet or equal the listings for presumptive disability at step three.

The ALJ also found Ms. Duncan not credible and determined that her impairments left her with a residual functional capacity ("RFC") to perform a limited range of sedentary work with certain restrictions. After considering Ms. Duncan's RFC and testimony from a vocational expert ("VE"), the ALJ determined at step four that Ms. Duncan could not return to her past work, but found at step five that she could perform other jobs existing in significant numbers in the national economy.

The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). Ms. Duncan sought judicial review and the magistrate judge, sitting by consent of the parties, affirmed the Commissioner's decision. She now appeals.

## II. Discussion

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). In doing so, "we neither reweigh the evidence nor substitute our judgment for that of the agency." *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires

- 3 -

more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084 (citation omitted) (internal quotation marks omitted).

Ms. Duncan raises the following challenges to the Commissioner's decision: the ALJ (1) deprived Ms. Duncan of her constitutional right to due process; (2) failed to properly evaluate the medical evidence; (3) failed to find that Ms. Duncan met or equaled Listing 1.04A (Disorders of the Spine); (4) erred at steps four and five of the sequential analysis; and (5) failed to perform a proper credibility determination.

**A. Due Process**

Ms. Duncan contends the ALJ violated her due process rights by failing to make a full and fair inquiry. Indeed, "[s]ocial security hearings are subject to procedural due process considerations." *Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005); *see also Passmore v. Astrue*, 533 F.3d 658, 663 (8th Cir. 2008) ("Procedural due process under the Fifth Amendment requires that disability claimants be provided a full and fair hearing." (internal quotation marks omitted)). But, as the district court observed, Ms. Duncan does not assert a colorable due process constitutional claim. Instead, her argument is one that asserts that the ALJ failed to develop the record by failing to order a consultative examination or obtain a medical source statement. We disagree that the ALJ failed to develop the record.

"[T]he burden to prove disability in a social security case is on the claimant." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Nonetheless, an "ALJ bears responsibility for ensuring that an adequate record is developed during the

disability hearing consistent with the issues raised." *Branum*, 385 F.3d at 1271

(internal quotation marks omitted). And this responsibility may require the ALJ to

order a consultative examination, s*ee Hawkins*, 113 F.3d at 1166, but the

determination to do so is given broad latitude, *id*. at 1169. Such examinations are

often required "where there is a direct conflict in the medical evidence"; "where the

medical evidence in the record is inconclusive"; and "where additional tests are

required to explain a diagnosis already contained in the record." *Id*. at 1166; *see also*

20 C.F.R. § 404.1519a(b) (describing when a consultative examination may be

appropriate).

During Ms. Duncan's first administrative hearing in March 2011, her attorney

requested, and the ALJ ordered, additional testing in the form of a bilateral

electromyography/nerve conduction study (EMG/NCS) of the upper and lower

extremities, and bilateral Tinel's test and Phalen's test.[1] *See* Aplt. App., Vol. II at

83-86.[2] Sri Reddy, M.D. performed a consultative EMG/NCS in May 2011. The

EMG/NCS of the upper limbs revealed "[r]ight mild median nerve entrapment at the

wrist (C[arpal]T[unnel]S[yndrome])" but "[n]o diffuse peripheral neuropathy" or

"any findings to indicate radiculopathy." *Id*., Vol. III at 594. The testing of the

lower limbs revealed "[b]ilateral lower extremity sensory peripheral neuropathy" but

---

[1] Tinel's Sign and Phalen's Sign are tests performed to diagnose carpal tunnel syndrome.

[2] The record reveals that Ms. Duncan's attorney and the ALJ also discussed Ms. Duncan's need for a cervical magnetic resonance imaging (MRI) scan. *See* Aplt. App., Vol. II at 85. This testing was done on September 7, 2011.

no "findings to indicate radiculopathy." *Id*. Dr. Reddy opined this finding was probably the result of Ms. Duncan's "long-standing diabetes." *Id*.

After receiving the results of the study, Ms. Duncan's counsel requested a consultative examination and medical source statement to evaluate the "right upper extremity median nerve entrapment and bilateral lower extremity sensory peripheral neuropathy." *Id*., Vol. II at 260. But the request was not granted. A second administrative hearing was held in October 2011. At the time of the second hearing, Ms. Duncan had recently undergone an MRI scan of the cervical spine that revealed "marked degenerative disc disease" and a "syrinx formation extending from the C4-C5 to the C6-C7 level." *Id*., Vol. III at 696.[3]

Ms. Duncan argues that without obtaining more information concerning the functional limitations caused by the conditions found by Dr. Reddy in the May 2011 EMG/NCS and the conditions revealed in the September 2011 MRI testing, the ALJ could not make an informed RFC assessment. *See* Aplt. Opening Br. at 20-21. We disagree. Regarding the EMG/NCS finding of "right median nerve entrapment at the wrist (C[arpal]T[unnel]S[yndrome])," the record already contained evidence of

---

[3]  "A syrinx is a fluid-filled cavity within the spinal cord (syringomyelia)." *Syrinx of the Spinal Cord or Brain Stem*, Merck Manuals, http://www.merckmanuals.com/professional/neurologic_disorders/spinal_cord_disord ers/syrinx_of_the_spinal_cord_or_brain_stem.html (last visited March 18, 2015). "Syringomyelia typically causes weakness, atrophy, and often fasciculations and hyporeflexia of the hands and arms." *Id*.

Ms. Duncan's bilateral carpal tunnel syndrome. The record also contained an examining consultative examination, done in January 2010, that opined regarding Ms. Duncan's physical limitations concerning her carpal tunnel syndrome, *see* Aplt. App., Vol. III at 385, as well as an opinion from another medical source in March 2010 that Ms. Duncan was limited to light duty jobs that did not require repetitive work with the hands and arms. We conclude that the ALJ did not err by not obtaining another consultative examination or medical source statement to evaluate Dr. Reddy's findings concerning Ms. Duncan's carpal tunnel syndrome. The record contained sufficient evidence from which the ALJ could assess Ms. Duncan's RFC with respect to her carpal tunnel syndrome. Regarding Dr. Reddy's finding of diabetic peripheral neuropathy, Ms. Duncan similarly fails to show that another consultative examination was necessary.

Ms. Duncan further argues that recent testing "revealed more questions about neuropathy, radiculopathy, carpal tunnel syndrome, syrengomyelia, and a syrinx" that should have resulted in further investigation by the ALJ to determine the limitations of Ms. Duncan's extremities. Aplt. Opening Br. at 21 (citing Aplt. App., Vol. II at 41-46). Ms. Duncan's citation to the record evidences that her counsel and the ALJ discussed a September 2011 MRI scan of the cervical spine in the context of counsel's claim that the MRI scan was evidence of meeting Listing 1.04A. *See* Aplt. App., Vol. II at 41-42. In this discussion, the ALJ observed that two, separate EMG/NCS examinations, one performed by consultative examiner Dr. Reddy and the

other performed at the request of Ms. Duncan's physician, confirmed carpal tunnel syndrome and did not evidence any radiculopathy.  The ALJ further observed that although a medical provider, Tulsa Pain Consultants, assessed cervical radiculopathy, it did not place any work restrictions on Ms. Duncan.  *See id*. at 43.  We conclude the ALJ sufficiently developed the record to determine Ms. Duncan's RFC.[4]

### B.  Medical Source Opinions

Ms. Duncan next argues that the ALJ failed to properly evaluate the medical opinions of Kenneth Trinidad, D.O., and Carl DePaula, M.D.  We find no error.

### 1.  Dr. Trinidad

Dr. Trinidad is an examining physician who evaluated Ms. Duncan in connection with her worker's compensation claim in March 2010 and again in April 2011.  Ms. Duncan first asserts that the ALJ "ignored or rejected medical findings without explanation" and ignored those portions of Dr. Trinidad's reports that were favorable to her claim.  Aplt. Opening Br. at 24.  Specifically, she states the ALJ "failed to note" the following findings from the March 2010 report:

> positive Tinel's sign over the median nerves bilaterally, crepitance in the wrists with range of motion ('ROM') testing, weakness in flexion and extension of the wrists to resistance testing, loss of fine motor movement in the

---

[4]     Ms. Duncan also points out that although the ALJ agreed at the March 2011 hearing to additional testing for Tinel's Sign and Phalen's Sign, there is no indication that this was done.  *See* Aplt. Opening Br. at 20.  Although it appears Ms. Duncan is correct, the record already contained medical evidence from October 2010 of positive Tinel's Sign and Phalen's Sign testing, which is indicative of carpal tunnel syndrome. Accordingly, we perceive no error.

digits, decreased sensation in the first three digits of the right hand, dyesthesias in the first four digits of the left hand, decreased sensation in the little finger of the left hand, tenderness over the medial epicondyles bilaterally, crepitance in the elbows with movement, positive Tinel's sign over the ulnar nerves at the elbows, decreased sensation in an ulnar distribution into the forearms, and weakness in forearm strength in supination and pronation to resistance testing bilaterally.

*Id*. at 23-24.

But despite Ms. Duncan's claim of error, while "[t]he record must demonstrate that the ALJ considered all of the evidence," there is no requirement that an ALJ "discuss every piece of evidence." *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014). The ALJ did not need to expressly discuss these specific findings of Dr. Trinidad as they did not involve "uncontroverted evidence" that the ALJ was choosing not to rely on, nor did they involve "significantly probative evidence" that he was rejecting, *see Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). The record confirms this.

In connection with the worker's compensation claim, Dr. Trinidad concluded that Ms. Duncan had work-related trauma injuries in the form of bilateral carpal tunnel syndrome. The ALJ's decision states that "a review of the medical record indicates" a history of carpal tunnel syndrome and bilateral carpal tunnel syndrome surgery. Aplt. App., Vol. II at 17. It further reflects that Dr. Trinidad's March 2010 report was considered in the ALJ's discussion of the medical evidence. *See id*. at 18. And the ALJ found that the medical evidence in the record supported a diagnosis of

carpal tunnel syndrome as he found mild carpal tunnel syndrome bilaterally as a severe impairment. We perceive no error in the ALJ's failure to expressly discuss the foregoing findings of Dr. Trinidad.

Ms. Duncan also argues that the ALJ failed to adequately explain why he gave Dr. Trinidad's opinions provided in the worker's compensation claim "only some weight." Aplt. Opening Br. at 26. We disagree. Dr. Trinidad opined that Ms. Duncan was temporarily totally disabled. He also opined that "[w]ith her current impairment [Ms. Duncan] is unable to return to her former position and, in my opinion, will require vocational training to place her in a light duty job that does not require repetitive work with her hands and arms." Aplt. App., Vol. III at 533. The ALJ explained that such statements, made in the context of a worker's compensation claim, are not dispositive of a social security claim. The ALJ also correctly observed that certain opinions by medical providers, including opinions that a claimant is disabled or opinions concerning residual functional capacity, are not medical opinions but, instead, opinions on issues reserved to the Commissioner because they are administrative findings. *See* 20 C.F.R. § 404.1527(d). Such opinions, even when offered by a treating source, are never entitled to controlling weight or given special significance. Soc. Sec. Ruling (SSR) 96-5p, 1996 WL 374183, at *1, *2, *5 (July 2, 1996).

But Ms. Duncan takes further issue with the ALJ's handling of Dr. Trinidad's opinion that Ms. Duncan is limited to jobs that do not require repetitive use of the

hands and arms. The record shows that Ms. Duncan specifically questioned the VE regarding the vocational impact of a limitation to sedentary, unskilled work with no repetitive use of the arms or hands as expressed in Dr. Trinidad's report. The VE testified that no repetitive use equated vocationally to constant use under the Dictionary of Occupational Titles, but that frequent and occasional use was still available. The ALJ noted this testimony in his decision. But Ms. Duncan now contends that there is no evidence that Dr. Trinidad defines "repetitive" in the same way as the VE and the ALJ therefore should have recontacted Dr. Trinidad.

We find Ms. Duncan's argument unavailing. Assuming, without deciding this is a substantial issue, Ms. Duncan did not further question the VE regarding the meaning of repetitive use or challenge the VE's interpretation of Dr. Trinidad's use of the term such that she raised it as an issue for the ALJ to resolve. *See Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009) (observing that claimant must raise any substantial issue she seeks to develop). Nor did the ALJ deem Dr. Trinidad's evidence inadequate for him to determine whether Ms. Duncan was disabled. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (noting ALJ's duty to seek additional evidence or clarification from treating source when evidence contains conflict or ambiguity).

In sum, we conclude the ALJ sufficiently explained the weight he gave to Dr. Trinidad's opinions and properly considered his opinions.

## 2. Dr. DePaula

Dr. DePaula is Ms. Duncan's treating orthopedic surgeon. Ms. Duncan argues that the ALJ was "silent" as to the weight accorded Dr. DePaula's opinions and failed to follow the sequential two-step inquiry in determining the weight assigned to a treating source's medical opinion. Aplt. Opening Br. at 27-28; *see also Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (discussing two-step analytical framework for dealing with treating medical source opinions). In support, Ms. Duncan states that Dr. DePaula found that she had peripheral neuropathy with numbness at the wrist, bilateral carpal tunnel syndrome, diabetic neuropathy, and cervical disc disease but that the ALJ "gave no credit to these assessments and objective findings." Aplt. Opening Br. at 28. Ms. Duncan is mistaken. The findings of Dr. DePaula identified by Ms. Duncan constitute the medical opinion of Dr. DePaula regarding medical diagnoses, which the ALJ properly considered and did not reject. *See* 20 C.F.R. § 404.1527(a)(2) (providing that medical opinions are statements from physicians that reflect judgments concerning a claimant's symptoms and diagnosis). Indeed, the ALJ found diabetes with diabetic neuropathy, mild carpal tunnel syndrome bilaterally, and degenerative disc disease of the cervical spine to be severe impairments.

Ms. Duncan does not point to medical opinions of Dr. DePaula regarding work-related limitations attributed to the impairments he diagnosed or the placement of any significant exertional restrictions. *See, e.g.*, *Watkins*, 350 F.3d at 1299

(assessing treating source medical opinion concerning nature and severity of impairment that rendered claimant "unable to work an eight-hour day doing anything, sitting or standing" (internal quotation marks omitted)); *Krauser*, 638 F.3d at 1330 (assessing treating source's opinion regarding exertional restrictions); 20 C.F.R. § 404.1527(a)(2) (providing that physician's medical opinion may include opinion on what claimant can still do despite impairments and physical or mental restrictions). Given that the ALJ did not reject the medical impairments found by Dr. DePaula and there were no medical opinions regarding Ms. Duncan's work-related functional limitations, there was no opinion on such matters by Dr. DePaula for the ALJ to weigh. *Cf. Watkins*, 350 F.3d at 1300-01 (reversing judgment of the district court where ALJ failed to perform analysis regarding weight to assign treating source's opinion that claimant could not do anything sitting or standing in eight-hour workday).

Ms. Duncan further faults the ALJ for failing to credit a parking placard application in which Dr. DePaula indicated the basis for the application was Ms. Duncan's severely limited ability to walk due to her diabetic peripheral neuropathy. Dr. DePaula did not, however, identify a similar work-related restriction in his medical notes. In any event, the ALJ's RFC limited Ms. Duncan to sedentary work and standing and/or walking to two hours in an eight-hour workday. Finally, Ms. Duncan's claim of error regarding Dr. DePaula's opinion that Ms. Duncan is disabled and should get vocational rehabilitation is meritless. As the ALJ explained,

that is an opinion on an issue reserved to the Commissioner and, therefore, is not entitled to controlling weight or special significance. *See* 20 C.F.R. § 404.1527(d)(3).

### C. Listing 1.04A

Ms. Duncan next claims error at step three. Specifically, she asserts that the ALJ failed to conclude that she met or equaled Listing 1.04A (disorders of the spine) and failed to properly consider Listing 1.04A at step three because the ALJ did not mention or discuss it in the step three analysis.

At step three of the sequential analysis, the determination is made whether any "medically severe impairment, alone or in combination with other impairments, is equivalent to any of a number of listed impairments so severe as to preclude substantial gainful employment." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (internal quotation marks omitted). If listed, the impairment is conclusively presumed disabling and the claimant is entitled to benefits. *See id*. A claimant will only be presumed disabled if an impairment, or a combination of impairments, meets or equals all the requirements of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). Further, a claimant has the burden to present evidence establishing her impairments meet or equal listed impairments. *Fischer-Ross*, 431 F.3d at 733. But an ALJ bears the burden of identifying any relevant listings in light of the evidence which a claimant has produced. *Id*. at 733 n.3.

Ms. Duncan was diagnosed with degenerative disc disease of the cervical spine, an impairment that would fall under the listing for disorders of the spine, Listing 1.04, where the impairment results in the compromise of a nerve root. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. In order for the ALJ to have found Ms. Duncan's physical limitation met the required level of severity under Listing 1.04A, Ms. Duncan had to satisfy the following requirements:

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

As Ms. Duncan argues, an ALJ is "required to discuss the evidence and explain why he found that [a claimant] was not disabled at step three." *Clifton*, 79 F.3d at 1009. Review of the ALJ's decision reflects that he discussed and rejected certain listings applicable to mental impairment in his step three analysis but did not address or evaluate Listing 1.04A in this part of the decision. Instead, the ALJ's discussion of Listing 1.04A, although minimal, appears in his analysis and determination of Ms. Duncan's RFC at step four of the sequential analysis. *See, e.g.*, *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (providing that step four is comprised of three phases, the first of which determines a claimant's RFC).

Specifically, the ALJ acknowledged that Ms. Duncan's counsel argued at the hearing that Ms. Duncan met or equaled Listing 1.04A based on MRI findings of the

- 15 -

cervical spine done in September 2011. The ALJ explained, however, that two EMG/NCS examinations revealed no evidence of radiculopathy or other upper extremity neuropathy. Although the ALJ should have discussed this evidence and his rationale in the step three analysis, we cannot say, as Ms. Duncan argues, that the ALJ "wholly failed to analyze the evidence in light of the specific requirements of [Listing 1.04A]." Aplt. Opening Br. at 32. Indeed, the Listing requires evidence of nerve root compression and the ALJ expressly found no evidence of radiculopathy indicated in the EMG/NCS.[5] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00C(3) (providing that "electrodiagnostic procedures may be useful in establishing a clinical diagnosis but do not constitute alternative criteria to the requirements of 1.04").

But even if the ALJ's failure to properly consider and discuss the evidence in support of Listing 1.04A at step three was erroneous, the error was harmless in light of the ALJ's findings at subsequent steps of the disability analysis. *See Fischer-Ross*, 431 F.3d at 733 ("[A]n ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment."). Presumptive disability at step three for Listing 1.04A requires nerve root compression resulting in limited range of motion and motor loss with muscle weakness. The ALJ's RFC

---

[5] "Cervical radiculopathy is the damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed." *See Cervical Radiculopathy*, http://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited March 18, 2015).

findings at step four provide, for example, that Ms. Duncan can occasionally lift and/or carry ten pounds, and she can occasionally climb stairs, balance, bend or stoop, kneel, crouch, and crawl. This RFC finding negates the possibility of any finding that Ms. Duncan is conclusively disabled at step three, and, therefore, any deficiency in the ALJ's step three analysis is harmless error. *See id*. at 734-35.

Finally confirming the harmless nature of any error at step three, Ms. Duncan presented no medically acceptable test showing nerve root compression, a requirement of Listing 1.04A. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(C)(1) (providing that diagnosis of musculoskeletal impairment should be supported by medically acceptable imaging tests, such as x-ray or MRI scan). Because Ms. Duncan has not satisfied all of the Listing's criteria, she cannot prevail at step three as a matter of law. *See Sullivan*, 493 U.S. at 530.

### D. Hypothetical Question to the VE

Ms. Duncan next contends that the ALJ's hypothetical questions to the VE at steps four and five of the analysis failed to include all of the limitations established by the record.[6]

---

[6] In challenging the ALJ's hypothetical questions, Ms. Duncan attempts to raise a sub-issue concerning the ALJ's step two analysis. Although she does not expressly assert a step two error, she argues that the ALJ failed to state whether her middle and ring finger trigger release and anxiety disorder were "severe, non-severe, or medically non-determinable [impairments]." Aplt. Opening Br. at 33. To the extent Ms. Duncan attempts to advance an independent challenge to the ALJ's step two findings within the context of her steps four and five argument, we decline to

(continued)

- 17 -

An ALJ's hypothetical question to the VE must accurately reflect the "impairments and limitations that were borne out by the evidentiary record." *Newbold v. Colvin*, 718 F.3d 1257, 1268 (10th Cir. 2013) (internal quotation marks and brackets omitted); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (stating that the ALJ's hypothetical questions "must include all (and only) those impairments borne out by the evidentiary record"). The ALJ's RFC finding included a limitation for "no prolonged overhead gazing." Aplt. App., Vol. II at 16. Review of the record shows that the ALJ posed three hypothetical questions to the VE – the first two of which were limited to light work and the third to sedentary work. *See* 20 C.F.R. § 404.1567(a) and (b) (defining "sedentary work" and "light work"). In the second hypothetical question to the VE, the ALJ asked the VE to take the same physical restrictions from the first hypothetical question and add to them certain restrictions to the hands and arms and "no prolonged overhead gazing." Aplt. App., Vol. II at 62. In the third hypothetical question, the ALJ stated that he was using the same restrictions for the upper extremities but changed the exertional limitations.

Ms. Duncan argues that the "no prolonged overhead gazing" limitation is missing from the third (and only sedentary) hypothetical question and, therefore, the VE could have answered the hypothetical question differently. We disagree. Based

consider the issue. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (declining to consider poorly developed sub-issues).

- 18 -

on our review, the third hypothetical question simply built upon the second, which included the limitation for no prolonged overhead gazing. Additionally, Ms. Duncan's counsel questioned the VE regarding the impact of Ms. Duncan's limitations in her ability to look up and down and the VE testified in response that she considered Ms. Duncan's range of motion limitations in her testimony. We therefore reject Ms. Duncan's challenge to the hypothetical question to the VE and find no error in the ALJ's reliance on the VE's opinion.

Ms. Duncan also argues that the ALJ's RFC finding included a limitation to superficial contact with coworkers, supervisors, and the public, but that the ALJ did not include this limitation in the hypothetical question to the VE involving sedentary work. She argues that the failure to include this limitation was erroneous because the jobs in the national economy that the VE testified Ms. Duncan could perform in response to the hypothetical – call-out operator, surveillance-system monitor, and election clerk – require "significant" contact with people or the public according to the DOT. Aplt. Opening Br. at 36; *see* DICOT 237.367-014 (call-out operator), 1991 WL 672186; DICOT 379.367-010 (surveillance-system monitor), 1991 WL 673244; and DICOT 205.367-030 (election clerk), 1991 WL 671719.

"[E]ach job listed in the DOT is described by reference to various components. One component [of the DOT occupational code] is 'Worker Functions.' The worker function labeled 'People' expresses the degree of interaction with other people that the job requires." *Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005). The

- 19 -

three jobs identified by Ms. Duncan have a People rating of 6, indicating that the worker will be involved in "Speaking-Signaling" which requires "[t]alking with and/or signaling people to convey or exchange information [and]giving assignments and/or directions to helpers or assistants." DOT, Appendix B – Explanation of Data, People, and Things, 1991 WL 688701 (4th ed. 1991). As Ms. Duncan notes, the three jobs at issue also have an "S-Significant" People rating.

We agree that the sedentary hypothetical question to the VE did not include the limitation to "superficial contact with coworkers, supervisors, and the public." We conclude the omission does not require reversal, however, because any error was harmless. As we noted in *Hackett*, the full DOT job descriptions for the jobs of call-out operator and surveillance system monitor "indicate that contact with people is rather limited." *Hackett*, 395 F.3d at 1175. Accordingly, at least two of the three jobs identified by the VE are consistent with the restriction of "superficial contact with coworkers, supervisors, and the public." *See, e.g.*, *id.* at 1175-76 (concluding that there was no conflict between DOT's job descriptions for call-out operator and surveillance-system monitor stating that jobs required significant contact and VE's testimony that jobs were suitable for claimant with restriction of avoiding direct contact with the general public and only occasional interaction with coworkers). Any error was therefore harmless. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (noting that improper reliance on two of three jobs identified by VE could have been deemed harmless error "had the number of available jobs identified by the VE

[in the one occupation consistent with the claimant's RFC] not been one hundred but considerably greater").

### E. Credibility

Finally, Ms. Duncan challenges the ALJ's credibility determination. She argues that the ALJ mischaracterized her activities of daily living, made non-specific references to "other evidence" to support the credibility determination, and did not properly evaluate two treating physicians' opinions that she was disabled. Aplt. Opening Br. at 39.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (internal quotation marks omitted). Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (internal quotation marks omitted).

When evaluating a claimant's subjective statements regarding pain, an ALJ should consider factors such as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

- 21 -

*Id*. at 1145 (internal quotation marks omitted). But contrary to Ms. Duncan's claims, an ALJ is not required to address each factor in his decision. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (observing that credibility assessment does not require "formalistic factor-by-factor recitation of the evidence" but instead requires reference to specific evidence the ALJ does rely on).

The ALJ found that Ms. Duncan's statements concerning the limiting effects of her disabling pain were not entirely credible in light of discrepancies between her alleged symptoms and objective medical evidence in the record. In reaching this credibility determination, the ALJ discussed the medical evidence and Ms. Duncan's testimony. In terms of daily activities, the ALJ noted that Ms. Duncan can perform household chores with the help of her husband, has a driver's license and is able to go shopping, and carries above her head but that she needs help with bathing, cooking, and tying her shoes. The ALJ found that Ms. Duncan's medical care had been routine and conservative in nature; that treatment for her degenerative disc disease of the cervical spine included medication management; and that there were no side effects from the use of medications. The ALJ also noted the absence of any pathological clinical signs or significant medical findings of severe, disabling pain. He further discussed a comprehensive medical examination in 2010 that found that Ms. Duncan had a full, active range of motion of her hands and observation during examination showed that she could use her hands. The ALJ further stated that Ms. Duncan's description of limitations was generally inconsistent and, further, that

her credibility was eroded by a history of numerous violations of the law and subsequent incarcerations.

We conclude the ALJ considered the appropriate factors in assessing Ms. Duncan's credibility and adequately tied his credibility findings to substantial evidence in the record.

### III.    Conclusion

The judgment of the district court is affirmed.

Entered for the Court

Jerome A. Holmes
Circuit Judge